IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAGMAR E. JENSON,                          *
    Petitioner

                                  *  CIVIL ACTION NO. AMD-04-781

    v.

                                  *

MARSHA MALOFF, *et al.,*
    Respondents                            *
                                  ***

## MEMORANDUM

Now before the court is the amended petition of Dagmar E. Jenson for a writ of habeas corpus pursuant to 28 U.S.C. Section 2254 (Paper Nos. 1 and 19), the state's answer thereto (Paper Nos. 13 and 22), and petitioner's replies. (Paper Nos. 16 and 33). The briefing has been fully considered and no hearing is needed. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. Section 2254(e)((2). For the reasons that follow, the petition will be dismissed with prejudice.

## *PROCEDURAL HISTORY*

Petitioner was indicted on April 21, 1997, in the Circuit Court for Baltimore County for first degree murder and handgun offenses. After a four-day jury trial presided over by the Honorable Alfred Brennan, petitioner was convicted.

The Maryland Court of Special Appeals summarized the evidence as follows in its opinion affirming the convictions:

> Theodore Daniels was 57 years old, six feet tall, and weighed approximately 170 pounds at the time of his death; appellant was 48 years old, five feet four inches tall, and weighed 140 pounds. Daniels was self-employed at the time of his death and operated an insurance business called Prepaid

Legal Services, as well as other businesses. Appellant was associated with Daniels in his Prepaid Legal Services business.

The Maryland Motor Vehicle Administration listed Daniels's residence as a home he owned with his wife in Woodlawn. At the time of his death, however, Daniels was living with a girlfriend in Sparks, Maryland. He also maintained a residence at 5312 Wayne Avenue near his Woodlawn, Baltimore County, office. Appellant lived in a row home in Baltimore City; she shared the home with a man who rented the top floor from her.

Appellant first met Daniels in November 1996 while she was exploring the possibility of joining his Prepaid Legal Services operation. By the first or second week of January 1997, their relationship became sexual. Daniels told appellant that he was still married but had been separated from his wife for approximately twenty years. Appellant asked Daniels repeatedly about where he lived, but he evaded these questions by telling her that if she were patient she would eventually see where he lived.  Daniels once took her to his house on Wayne Avenue, but this visit did not allay her suspicions that he actually lived elsewhere. Daniels never told appellant about his residence in Sparks, Maryland.

Russell Johnson, a business associate of Daniels, testified that he had known Daniels for over thirty years and that he and Daniels had started the Prepaid Legal Services business together. Through the business, Johnson met appellant. Appellant told Johnson that she was having a personal as well as a business relationship with Daniels and that she was dissatisfied with information that Daniels was giving her regarding his personal life.  Especially annoying to Ms. Jensen was the fact that Daniels would not tell her where he lived. Appellant telephoned Johnson on multiple occasions to ask him if he had seen Daniels, had any contact with him, or knew, why Daniels had not called or seen her.

Johnson learned of a disagreement between appellant and Daniels that occurred on Sunday, February 16, 1997, which was two days prior to Daniels' death. On that date, Daniels asked Johnson to fill in for him on a radio program that the two hosted to promote their Prepaid Legal Services business. Daniels told Johnson that he was with appellant at the time and that the two were "trying to work out some things."

\*       \*       \*

Daniels' corpse was found in his business office located on the second floor of a two-story office building at 2133 Gwynn Oak  Avenue in Woodlawn, Maryland. The building contained five separate businesses.  The first floor housed a motorcycle shop and the Woodlawn Beauty Salon.  These businesses had no direct access to the second floor of the building.  Daniels's Prepaid Legal Services office, a civil process serving business, and the Something Sassy Hair Salon occupied the second floor.  Access to the second story was limited to two entrances, one at street level at the front of the building and another at the top of a set of outdoor metal stairs located at the rear of the building.  Both the front and rear entrances to the second floor had doors with deadbolt locks that required a key to unlock.  One key operated both locks. Appellant did not have a key to the locks.

The front entrance to the building opened into a hallway that contained stairs leading to the second floor.  The rear entrance was located next to a landing a top a metal staircase that led down to a parking lot behind the office building.  The rear entrance had two doors–an unlocked aluminum storm door and a wooden interior door with a deadbolt lock.  The interior door had three horizontal panes of glass in the upper half of the door.  The lower border of the bottom pane was 38 inches above the landing. Each of the glass panes measured 11 ½ inches high by 22 ½ inches wide.  The rear entrance opened directly in the common hallway shared by the businesses on the second floor of the building.

\*        \*        \*

On Tuesday, February 18, 1997, at approximately 7:30 p.m. the owner of the Something Sassy Hair Salon and one of her employees were leaving after closing the salon. The salon was next to Daniels's office space, which had two rooms–Daniels's office and a conference room. Both the owner and the employee of the hair salon checked the rear entrance of the building to make sure that it was locked.  They found that the rear door was locked and that the window panes were intact.  The salon owner, hearing Daniels's television playing in his office knocked on Daniels's door. Daniels answered, and the owner told him that he was closing up and asked whether he wanted the front door locked.  Daniels said that he was expecting a visitor and that she should leave the front door unlocked. When the salon owner and her employee left the building, they did not lock the front door.

On the evening of the murder, Theodore Daniels, Jr. (Daniels Jr.), was driving home from evening classes at Morgan State University when he

passed his father's office and noticed that the lights were on and his father's car was still parked in the rear parking lot. Thinking that his father was working, he decided to stop by for a visit. Daniels, Jr., could not be precise as to the time he arrived at the office except to say, "It had to be after 8:00." The front entrance was locked when he arrived so Daniels, Jr., used his own set of keys to enter the building. He then re-locked the front door. As he walked upstairs, Daniels, Jr., could hear that the television in his father's office was on at a very high volume. He arrived at the door to his father's office and found that it, too, was locked. He used one of his keys to unlock the office door and then found his father's body lying face down on the floor near the entrance. He turned his father's body over, called for emergency assistance, and attempted CPR, but the body was cold. He next heard the ambulance arrive so he went downstairs, unlocked the front door, and directed emergency personnel to his father's body.

At approximately 9:00 p.m., shortly after emergency personnel had arrived, police officers came to the scene and attempted to gain entrance to the building via the second floor back door. After ascending the rear stairs, these officers noticed that the pane of glass in the bottom window opening of the interior door had been broken, that there were shards of glass lying on the floor both inside and outside the door (there was more glass on the exterior side of the door), and that there was blood smeared on the interior and exterior of the door and on the broken glass. The blood smears suggested that someone had been cut by the broken glass. The blood smears were heavier on the exterior portion of the door. It also appeared to the officers, based on where the glass landed that the glass was broken from the inside of the building while the storm door was closed.

Because the interior rear door was locked, the officers attempted to kick open the door. This action jarred additional glass out of the broken window pane that landed on the hallway floor. Daniels, Jr., haring the commotion went out into the hallway and unlocked the rear door.  Once the officers confirmed that Daniels was dead, they cleared the premises and secured the crime scene.

*     *     *

When the officers arrived at Daniels's office, they found his body lying near his desk. His clothing was bloodstained. A pair of bent eyeglasses, containing a shattered lens, lay immediately to Daniels's right. A tennis ball with signs of considerable damage, was further to the right of the eyeglasses.

-4-

The tennis ball apparently had been used as a "silencer" to muffle the sound of a gun as it was fired. Bullet fragments were found embedded in the floor. The office telephone was lying near the body with the hand set off the hook. Daniels's jacket was on a chair in the office. The jacket contained a set of keys to the building. Daniels was wearing a pager and had a twenty dollar bill in his pocket. Two televisions and a video cassette recorder were in the office but were left undisturbed.

Daniels had been shot four times with .38 caliber copper-jacketed, hollow-point bullets. All the bullets had been fired from the same weapon. Daniels had gunshot wounds to the neck, back, hip and chest, with each bullet entering his body at a downward angle. Because no gunshot residue was found near any of the entry wounds, the medical examiner concluded that each shot was likely fired from a distance of more than three feet from the body. With respect to the gunshot wound to the chest, the bullet entered the body in a manner that suggested that it had passed through the tennis ball first.

Daniels had various lacerations on his face, as well as scrapes and abrasions on his nose and knees. The medical examiner testified that the most serious of these non-gunshot wounds was a laceration above Daniels's left eye that was consistent either with Daniels having been struck in the head with a blunt object or with the left side of his face having struck the floor causing his eyeglasses to break and cut his eyebrow. The medical examiner was unable to determine whether Daniels was seated, standing, or kneeling at the time he was shot.

*     *     *

Baltimore County Police Detective Milton Duckworth arrived at the crime scene at 9:48 p.m. to commence his investigation. Duckworth found no signs of forced entry or exit from the building (other than the broken glass form the back door), nor did he find any signs of ransacking or robbery. Samples of the blood from the door were collected for testing, and the door was processed for fingerprints. Fingerprints and palm prints were also collected from Daniels's office, including prints from the telephone next to the corpse and from papers located in the office. No murder weapon was recovered.

Several days after the murder, Detective Duckworth returned to the crime scene in an effort to develop leads form the victim's papers. Duckworth

found a pink envelope in Daniels's mailbox that had not been in the mailbox on the night of the murder. The envelope contained a Valentine's Day card that Daniels had sent to appellant. The card had been returned because it was addressed incorrectly. The card was signed, "Sincerely your latest." After finding the Valentine's Day card, Detective Duckworth contacted appellant to ask her what, if anything, she knew about Daniels's death.

\*     \*     \*

Appellant first met with Duckworth on February 25, 1997, and informed him that she was a business associate of Daniels and also had been romantically involved with him. Appellant admitted that she had been sexually intimate with Daniels on at least four occasions; some of their assignations had occurred at Daniels's office.

Appellant said that after their romantic relationship started he began to pay less attention to her. In December 1996, he failed to call her for approximately two weeks. This caused appellant to conclude that Daniels was still married and was lying to her about being separated form his wife.

Appellant told Duckworth that she contacted Russell Johnson to express her displeasure with Daniels. Thereafter, sometime in early January, Daniels finally contacted her and the relationship resumed.

Appellant also told Duckworth that Daniels "had a secretive side to his life" and that this was starting to "piss her off." In this regard, appellant told Detective Duckworth that she had insisted at one point that Daniels take her to his residence, but he refused. Sometimes Daniels would telephone her and she would see the names of other women appear on her Caller Identification System monitor. This, too, upset appellant.

Appellant also told Detective Duckworth that she last saw Daniels two days prior to his death when the two had a Sunday morning breakfast together and later visited the Korean War memorial in Baltimore. On that day, appellant repeatedly asked Daniels to show her his driver's license so that she could learn his true home address.

Appellant informed Detective Duckworth that she had plans to meet with Daniels at 7:00 p.m. on the date of  his murder but did not keep the appointment because Daniels never called her to confirm the meeting.  When

asked about her whereabouts on the night Daniels was killed, appellant stated she had visited a convenience store across the street from her home around 7:30 p.m. and had spent the remainder of the evening at home. At approximately 11:00 p.m. on the night of the killing, she left a voice mail message on Daniels's phone.

When appellant was arrested on March 27, 1997, her hands were placed behind her back and her wrists were handcuffed. According to Detective Duckworth, appellant "wanted to demonstrate her agility" and "to show me that she could slip out of" the handcuffs by putting her handcuffed hands in front of her. Detective Duckworth did not allow appellant to demonstrate her ability in this regard.

\*       \*       \*

Five of the seventeen fingerprints recorded from the crime scene belonged to appellant. All of appellant's fingerprints were located on the interior side of glass panes on the deadbolted rear entrance door. One fingerprint in the office belonged to Daniels and one belonged to his son. Of the ten remaining fingerprints, four were sufficiently intact for comparison, but the police were unable to find matches for these. Of the unmatched prints, two were recovered from the interior glass panes of the rear door, one was recovered from the office telephone, and one was found on papers located in Daniels's office.

\*       \*       \*

Appellant provided a blood sample to the police for DNA testing. The sample was analyzed, and appellant's blood was found to be "consistent with" the blood that was found smeared on both sides of the rear door to Daniels's building. The probability that someone other than appellant was the source of the blood was 1 in 8,200 among Caucasians and 1 in 170,000 among African-Americans. Appellant is Caucasian.

\*       \*       \*

During their first meeting, appellant informed Detective Duckworth that she had once owned a .38 caliber handgun but that burglars had stolen it from her house. The gun was purchased in late 1993; the burglary occurred on February 4, 1994. Duckworth investigated the matter and learned that appellant reported a 1994 burglary to the police in which a .38 caliber model

85 Taurus revolver was stolen along with some computer-related items. A firearms expert testified that the bullets found at the crime scene could have been fired from the type of gun that appellant reported stolen in 1994. He conceded, however that a large number of firearms existed that could also have fired the fatal shots.

When the police searched appellant's house, they found the box for the Taurus handgun, bullets of the gun (these bullets were not the same type as used in Daniels's murder), and two computer monitors that appellant had reported stolen from her home when she reported the February 1994 burglary to the police.

\*     \*     \*

Seventeen days after Daniels's murder, on March 5, 1997, appellant attempted suicide. She left a suicide note on her computer that said:

> I do not want to live anymore. I have not killed Ted and I have lied. I will go to jail and my prints are there and my blood is there. I did not kill him. There is something very strange going on. I do not want to live. I cannot take the pain of horrible things people do.

\*     \*     \*

Appellant admitted that, subsequent to reporting her .38 caliber gun and computer equipment missing, she found (in 1996) two of the computer monitors for which she had been paid by the insurer, but she did not report the recovery to the insurance company or repay the money she had received for the monitors.

Appellant told the jury a different story regarding her alibi than what she had told Detective Duckworth one week after the crime. Although appellant still maintained that the last time she saw Daniels was two days prior to his murder, appellant admitted that her original statement to Detective Duckworth concerning her whereabouts on the night of the murder was false. Appellant testified that she was scheduled to meet with Daniels at eight o'clock on the night of the murder. She expected, however, that he would call to confirm the meeting.  Because she had not heard from Daniels, appellant left her home at approximately 8:00 p.m. and drove to Daniels's office.  She

arrived at approximately 8:20 p.m. and parked behind Daniels's building where she saw Daniels's car. She walked up the outdoor metal stairs to the rear entrance of the building. At the back door, she saw that one of the window panes in the door had been broken out; she heard a television playing loudly in Daniels's office and, after calling out for Daniels, she tried to open the interior door by reaching through the broken pane and attempting to turn the knob from the inside, As she stuck her hand through the broken window pane, she cut herself, leaving blood on the door and glass. Because the door had a deadbolt lock, appellant was unable to open it. She then left the premises and drove a short distance to Daniels's house on Wayne Avenue, but Daniels was not here. Ms. Jensen next went to her home at 843 South Kenwood Street, in Baltimore, Maryland. She later telephoned Daniels at approximately 11:00 p.m., leaving him a voice mail message. In the message, she neglected to mention the fact that the rear door to his office had been broken.

Appellant was not alarmed by the broken door at Daniels's office, nor was she afraid that there might be a burglar inside. It did not occur to her to report a possible burglary attempt to the police even though she happened to see, while she was attempting to gain entry into the building, a police officer parked near Daniels's office. Appellant did not attempt to page Daniels while she was near his office because she believed (for reasons that she did not explain) that he would not have returned the call.

The day after the murder, Daniels's business associate, Russell Johnson called appellant at work and informed her of Daniels's murder. Johnson said to her: "He's dead, did you do it Dagmar? I know you were arguing, did you do it?" Appellant's response to that question was not elicited at trial.

Appellant conceded that she did not tell Johnson that she had been to Daniels's office on the night of the murder, nor did she ever voluntarily contact the police to reveal this information.

Appellant testified that on other occasions when she visited Daniels's office, she usually entered through the back door–the door that was broken on the night of the murder. She last had sex with Daniels six days before he was killed. On that occasion she met him at his office and entered through the rear door, which Daniels opened with a key. According to appellant, while she enjoyed Daniels's company, she nevertheless had not been interested in a long-term commitment from him.

\*      \*      \*

At trial, Baltimore County Police Office Jane Irwin testified that on the night of the murder, at approximately 8:15 p.m., she issued a ticket to a male motorist less than a quarter of a mile from Daniels's building.  Officer Irwin originally pulled the motorist over because his taillight was not working, but later discovered that the vehicle was uninsured.  After issuing the driver two tickets, she had the car towed.  The driver was not arrested.  Officer Irwin completed the towing and ticketing by 9:00 p.m.  She heard the police call concerning Daniels's murder at about that time.

The defense also called a number of character witnesses who testified to appellant's good reputation for peacefulness.

*Jensen v. State*, 127 Md.App. 103, 106-116, 732 A.2d 319, 321-26 (footnotes omitted), *cert.*

*denied*,  356 Md. 178, 738 A.2d 855 (1999).

The jury convicted petitioner of first degree murder and use of a handgun in the

commission of a crime of violence. Petitioner was sentenced to life imprisonment for the

murder and a concurrent term of five years, without parole, for the handgun offense.

On appeal, petitioner raised two claims:

1.     Whether limited, wholly circumstantial evidence of criminal agency is sufficient to sustain a conviction when the evidence is entirely consistent with a reasonable theory of innocence?

2.     Whether the erroneous admission of prejudicial "bad acts" evidence constitutes plain error when such evidence not only precludes a fair trial but, in light of the insufficiency of the evidence, is likely the "but for" reason that the jury rendered a guilty verdict?

In her petition for *certiorari*, petitioner raised the following issues:

1.     Did the Court of Special Appeals err in refusing to consider whether the evidence offered by the State in Petitioner's trial, which evidence was entirely circumstantial, was consistent with a reasonable hypothesis of innocence and,

thus legally insufficient?

2. Assuming, arguendo, that the applicable standard for sufficiency of the evidence turns on a distinction between multiple strands and a single strand of circumstantial evidence did the Court of Special Appeals err in concluding that the State adduced evidence of multiple strands of circumstantial evidence of criminal agency?

3. Whether the court erred in finding sufficient circumstantial evidence of criminal agency, drawing an irrational inference that a 50 year old, 140 pound woman, climbed through the opening of a small, smashed out window, 36 inches off the ground, and measuring only 11 ½ inches high by 22 ½ inches wide, with jagged shards of glass, still along the perimeter including one triangular piece of glass measuring up to four inches, but with absolutely no evidence of blood, fibers, or flesh along that perimeter?

Thereafter, in an original and amended petitions, petitioner sought post conviction relief in the Baltimore County Circuit Court. On September 18, 2003, the post conviction court denied relief. Petitioner filed an application for leave to appeal the post conviction court's ruling, raising the following issues:

1. Whether the post-conviction court erred by concluding that the trial court had not violated Maryland Rule 4-326(c) when there is no evidence in the record establishing that the trial court discussed with Petitioner a note sent by the jury regarding the effect of a hung jury?

2. Whether trial counsel's  failure to object to the evidence of a demonstration conducted by police constituted ineffective assistance of counsel when the demonstration purported to resolve the most critical disputed issue in the case but was, in fact, substantially dissimilar to the facts at issue?

3. Whether the trial counsel's failure to object to hearsay evidence constituted ineffective assistance of counsel when the evidence purported to establish that the Petitioner and the victim had argued shortly before the murder and bolstered the State's theory of motive.

4. Whether the trial court erred in concluding that trial counsel's failure to object

to the introduction of an alleged suicide note was the result of a reasoned trial strategy.

5.      Whether the post-conviction court erred when it found that trial counsel's failure to move to suppress a card that was seized in violation of Ms. Jensen's Fourth Amendment rights did not constitute ineffective assistance of counsel.

On March 9, 2004, the Court of Special Appeals denied leave to appeal.

In this action, petitioner asserts that she was denied the right to be present at all stages of her trial and that trial counsel rendered ineffective assistance by failing to: (1) object to a demonstration at trial; (2)object to evidence concerning her suicide attempt; (3) object to hearsay evidence; and (4) move to suppress evidence.  Paper No. 1. She also alleges that the evidence was insufficient to sustain her conviction.  Paper No. 19.

*THRESHOLD CONSIDERATIONS*

A.  Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, she is required to exhaust each claim presented to the federal court by pursuing remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking *certiorari* in the Court of Appeals) and with other claims by way of a post conviction petition, followed by seeking leave to appeal from the Court of Special Appeals. Petitioner no longer has any direct or collateral review remedies available to her with respect to the

claims raised in this court. Accordingly, her claims are exhausted for the purpose of federal habeas corpus review.

B. Statute of Limitations

There is no contention that the petition is time-barred pursuant to 28 U.S.C. §2244(d).

C.  Procedural Default

The court does not find that any of petitioner's claims have been procedurally defaulted.

*ANALYSIS*

A. Standard of Review

Because the petition was filed after April 24, 1996, it will be decided under amendments to the habeas corpus statutes contained in AEDPA. *See Brown v. Angelone*, 150 F.3d 370 (4th Cir. 1998). Thus, this court's role is highly circumscribed. *See* 28 U.S.C. § 2254(d)(1) and (2).[1] In *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), the Supreme Court characterized section 2254(d) as a "new, highly deferential standard for evaluating state

---

[1]Section 2254(d) provides:
> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

court rulings." In *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), Justice O'Connor,

speaking for the majority, further elucidated:

> Section 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas corpus
> with respect to claims adjudicated on the merits in state court. Under Section
> 2254(d)(1), the writ may issue only if one of the following two conditions is
> satisfied -- the state-court adjudication resulted in a decision that (1) "was
> contrary to...clearly established Federal law, as determined by the Supreme
> Court of the United States," or (2) "involved an unreasonable application
> of...clearly established Federal law, as determined by the Supreme Court of the
> United States." Under the "contrary to" clause, a federal habeas court may
> grant the writ if the state court arrives at a conclusion opposite to that reached
> by this Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

*Id.* at 412-413. Justice O'Connor indicated that "the phrase 'clearly established Federal law,

as determined by the Supreme Court of the United States'. . . refers to the holdings, as

opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court

decision." *Id*. at 412. Furthermore, she indicated that:

> [u]nder Section 2254(d)(1)'s 'unreasonable application clause...a federal
> habeas court may not issue the writ simply because that court concludes in its
> independent judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly. Rather, that application
> must also be unreasonable."

*Id*. at 411. In other words, "a federal habeas court making the 'unreasonable application'

inquiry should ask whether the state court's application of clearly established federal law

was objectively unreasonable." *Id*. at 410. A state court decision involves an "unreasonable

application" of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id*. at 407-08, or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *see also Booth v. Nuth*, 288 F.3d 571 (4th Cir. 2002).

The Court applied these standards to a claim of ineffective assistance of counsel in *Bell v. Cone*, 535 U.S.685 (2002). It explained:

> For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. See *Williams,* supra, at 411. Rather, he must show [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id*. at 698-9.

In reviewing petitioner's attack on her state court convictions, the court presumes that factual determinations made by the state court are correct.  Petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Application of the above standards compels the conclusion that petitioner is not entitled to relief.

B.  Right to be Present

Petitioner claims that she was denied the right to be present at all stages of the

proceedings because the trial judge responded to a jury note without consulting her or her

counsel. In rejecting this claim, the state post conviction court found as follows:

> This is the sole allegation that does not involve a claim of ineffective representation by Jensen's trial attorney, Anton Keating. The first inquiry, therefore, must be whether Jensen offered evidence at the hearing sufficient to rebut the statutory presumption that she waived the alleged failure of Judge Brennan to comply with Md. Rule 4-326(c) in dealing with a note during jury deliberations. The note in question was found by post conviction counsel upon "a review of the court file" (3rd Am. Pet., p. 8), so it is reasonable to conclude that it was there when Jensen appealed her convictions.

> Jensen testified that she recalled the specific subject matter of several notes from the jury during their deliberations but did not remember being advised of any note about what would happen if they were unable to reach a verdict. She opined that she felt she would have remembered such a question. Both Judge Brennan and Mr. Keating testified that they had no independent recollection of any of the jury notes. The prosecutors proffered that they, too, lacked present recall as to how the note in question had been handled.

> I find that Jensen's testimony on October, 2001, that she couldn't recall being present when Judge Brennan discussed this one note, in February, 1998, is not enough to rebut the presumption of a knowing and intelligent waiver of a clear ground for appeal. I also note that Jensen was represented on that appeal by her post conviction counsel, who apparently could offer no additional testimony that would aid in rebutting the presumption.

> Recognizing that an appellate court may disagree with the above finding, I further find that Jensen failed to convince me, by a preponderance of the evidence, that Judge Brennan answered this note in contravention of Rule 4-326(c). The following is a reproduction of the note, the original of which will remain in the court file

> #2

> If we cannot reach a
> decision & it result in a
> "hung-Jury" - is the defendant
> lett (sic) off "Scott free" or re-tried

Juror 10

What happens after a hung jury should
not be considered by you

6:10 p.m.
2-13-98
ALB

As pointed out in the Third Amended Petition, the jury sent Judge Brennan six notes containing questions during the course of the trial.  Three of the last four came out during deliberations on February 13, 1998.  After comparing all six notes, it is clear that Judge Brennan was consistent in how he responded.  He wrote the response and the time beneath the question and initialed it.  It does not appear from the transcripts that he had a court reporter present when he discussed the questions with counsel, although, as Judge Brennan pointed out, there were five different court reporters involved in transcribing the trial and this naturally affected the uniformity and flow of the transcripts.  For example, the time that final arguments ended and the jury began deliberating on February 13th is not in the transcripts of the final arguments.  However, the jurors gave lunch orders as they went out.  Also, the first of the three notes that day, which was answered at 3:40 p.m., asked about one exhibit and whether a list of exhibits would be given to the jury, indicating that they had been deliberating for a relatively short time.

There is a transcript of Judge Brennan meeting briefly with the jury in open court at 6:10 p.m. on February 13th, to ask about dinner.  This is the precise time he wrote beneath his response to the note in question.  Moreover, the transcript states that the Defendant was present during this proceeding and again at 7:30 p.m. when Judge Brennan met with counsel to discuss a note asking for a visual presenter or a magnifying glass.  This again, is the precise time entered by Judge Brennan beneath his response to this note.

The consistency in how the notes were handled, the fact that all six were found in the court file after the trial and, most importantly, the transcript showing that Judge Brennan, counsel and Jensen were together at 6:10 p.m. when the Judge's response to this note was written and at 7:30 p.m. when he answered the next note gives rise to the reasonable inference that Judge Brennan's <u>correct</u> response to the hung jury question was discussed with counsel before it was given to the jury.  And, this inference is not rendered

-17-

unreasonable by Jensen's testimony that she didn't remember being advised
of such a note.

Finally, I disagree with the contention that this note would have
warranted giving an <u>Allen</u> charge. The question came after three to four hours
of deliberation following a four-day trial. Had he been asked to do so (and
there is no evidence that it was not discussed with counsel), Judge Brennan
may well have said no.

Paper No. 13, Ex. 28 at 2-6.

This court finds that the state court's factual determinations relative to the trial court's

handling of notes from the jury are supported by the record and are not unreasonable. The

post conviction court found that petitioner had not met her burden to show that she had not

been advised of the note from the jury. The evidence indicates that petitioner and counsel

were present in the court room at the time that the trial judge answered the jury's note.

Moreover, no one, other than petitioner, associated with the case had an independent

recollection of the notes received from the jury. Even if the state court's determination that

there was no constitutional error was "contrary to" or "an unreasonable application of"

Supreme Court precedent, petitioner is not entitled to relief unless she can demonstrate that

the error had a "substantial and injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks

omitted). Petitioner has failed to demonstrate that the trial judge erred in how he responded

to the note. The post-conviction court's findings of facts surrounding the jury note including

the substance of the ex parte communications and their effect on juror impartiality are

entitled to a presumption of correctness. *See Johnson v. Maryland*, 915 F. 2d 892, 896 (4th

Cir. 1990); *see also* 28 U.S.C.§ 2254(e)(1). The findings of the post-conviction court will not be disturbed here.

C. Ineffective Assistance of Trial Counsel

To establish a claim of ineffective assistance of trial counsel, petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). With regard to the first prong of this test, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. All circumstances are to be considered, and a court's scrutiny of counsel's conduct must be "highly deferential." *Id.* at 688-89. Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

1. Failure to Seek Suppression of the Valentine's Day Card

Petitioner contends that she was denied the effective assistance of counsel when trial counsel failed to seek suppression of the Valentine's Day Card that was addressed to petitioner and seized from the victim's mailbox. In reviewing this claim the post conviction court recounted the facts surrounding the seizure of the card as follows:

> Several days after the murder, Detective Duckworth returned to the crime scene in an effort to develop leads form the victim's papers. Duckworth

found a pink envelope in Daniels's mailbox that had not been in the mailbox on the night of the murder.  The envelope contained a Valentine's day card that Daniels had sent to the appellant. The card had been returned because it was addressed incorrectly.  The card was signed, "sincerely your latest."  After finding the Valentine's Day card, Detective Duckworth contacted appellant to ask her what, if anything she knew about Daniels's death.

Jensen argues that the detective's discovery of the Valentine's day <u>card</u> was critical in developing a case against her and was used to "establish an alleged motive in the form of a romantic relationship that had gone bad" (p. 18).  In addition, she claims that until the "police **opened the sealed envelope** they did not even know of the existence of Ms. Jensen, much less have probable cause to implicate her in the victim's murder." (3rd Am. Pet., p. 19).

Professor Grossman testified that Jensen had standing to move to suppress the undeliverable piece of mail even though it had been returned to the deceased victim's mailbox because, as the named addressee, Jensen had an expectation of privacy <u>as to its contents</u>.  He also opined that a motion to suppress probably would have been granted.

This argument is based, in part, upon a false premise.  Detective Duckworth testified at trial that the victim's two mailboxes were empty on the night of the murder and that he discovered the envelope containing the Valentine's Day card when he happened to look inside them four days later. While he did open the envelope, the card itself did not identify to whom it was sent.  That information was on the envelope in plain view of anyone who might look at it.  This is what led him to Jensen. (T.2/10/98, A.M. session, pp. 33-37).

Jensen does not contend that the detective violated her right of privacy by looking at the envelope.  Furthermore, at that moment in time, the only person with standing to complain about a warrantless search of the contents of the envelope would have been the victim's heirs or the personal representative of his estate.  The postal service had relinquished its control over this piece of mail by returning it to the address of the sender.

Mr. Keating testified that he considered pursuing suppression of the Valentine's Day care but decided not to do so because the evidence "cut both ways."  He felt that the sending of the card by the victim was inconsistent with the State's theory that Jensen's motive in committing the crime was that of a

spurned lover.  Also, he was proceeding on the assumption that Jensen would testify and would probably have to deal with these facts on cross-examination. The decision, therefore, was a part of Mr. Keating's overall trial strategy.  It does not become a basis for post conviction relief simply because Professor Grossman would have handled it differently.  This contention is rejected.

Paper No. 13, Ex. 28, p. 5-7.

Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed. *See Evans v. Thompson***,** 881 F.2d 117, 125 (4th Cir. 1989). Having examined the post conviction court's ruling in the light of the record as a whole, this court is satisfied that in applying the *Strickland* standard to the instant allegations of trial counsel's allegedly deficient performance, petitioner has not shown and cannot show that the post conviction court's rejection of petitioner's claim was either contrary to clearly established federal law, or involved an unreasonable application of that law.  Manifestly, the state court's recitation of the facts surrounding the seizure of the card are supported by the record before this court.  Accordingly, the state court's decision shall not be disturbed.

2.   Failure to Object to the Demonstration at Trial

Petitioner complains that trial counsel erred in failing to object to the state's demonstration employing a crime lab technician, who allegedly was not similarly proportioned to the petitioner, crawling through a door to demonstrate that the petitioner could have fit through the opening in the door to the decedent's office. As to this claim, the post conviction court ruled as follows:

-21-

These contentions are not supported by the testimony relating to the demonstrative evidence and do not take into account the right of jurors, as instructed by the trial judge, to exercise common sense in evaluating such evidence.

Mr. Keating [defense counsel], at the request of the prosecutor, had Detective Duckworth testify during cross examination as to the dimensional accuracy of the mock-up door that Mr. Keating thereafter placed in evidence:

Q:     I would like if you would please, Detective, take a look at this and see if it is close to–you hit a door in another door, storm door and they are pretty close the right heigh and weight and that kind of thing.

A:     I believe that this door is probably shorter, it had three panes of glass, but this is fairly representative of the door.

Q:     Now, let me point out one difference in this door I think you will notice so that–

A:     This should be up here.

Q:     And apart from that, you think that it fairly without being done to the – you have had a chance to measure it, did you not?

A:     Yes.

Q:     And it is–it was a little too high and therefore that is why we have had this–we added this?

A:     That is correct.

Q:     You are satisfied this is proximately (sic) the door as you saw it?

A:     Yes.

(T. 2/10/98 P.M. session, pp. 69-70).

Jensen contends that the mock-up still was not "substantially similar"

-22-

to the actual door because it did not contain glass shards in the frame of the broken glass panel and this somehow misled the jurors, even though the State had already introduced photographs showing how the actual door looked when the officers arrived on the scene that night.   I do not accept Professor Grossman's opinion that using a mock-up without glass shards fell below the standard of practice because the difference was obvious and could be taken into account by any juror exercising common sense.

I likewise fined no merit in the contention that Mr. Keating was guilty of ineffective representation when he failed to object to photographs of a re-enactment at the crime scene intended to show that a person could have exited the building afer removing the glass in the panel of the rear door and climbing through the opening  Jensen argues again that the absence of glass shards on that occasion and, more importantly, the disparity between the size and age of Jensen and the re-enactor, a police crime lab technician, "created a false impression and greatly prejudiced the jury against Ms. Jensen."

This argument is based upon two highly questionable assumptions. The first is that an objection to the photographs on these grounds would have been sustained.  Detective Duckworth orchestrated the re-enactment several weeks after the murder when he first learned that traces of blood found on the door were the same type as Jensen's blood.

Before these photographs were admitted, Mr. Keating questioned Detective Duckworth to establish the differences between the height and weight of the re-enactor and Jensen, and the absence of glass shards because the detective removed the entire piece of replacement glass before the technician climbed through.  It is more likely that the trial judge would have exercised his discretion in favor of the State and overruled an objection because the discrepancies affected only the weight of the evidence.

An additional factor bearing upon this evidence is the jury's ability to see the difference complained of so as to avoid being misled.  They had other photographs of the door showing the glass shards and the mock-up to show the size of the opening.  This also permitted Mr. Keating to buttress his tactical defense that the investigation was slanted and unfair to Jensen.

Paper No. 13, Ex 28, p. 7-10.

The court finds no basis on which to reject the post conviction court's ruling that trial

counsel's representation was ineffective in regard to the demonstrative evidence.

3.   Failure to Seek to Suppress the Suicide Note

Plaintiff alleges that she was denied the effective assistance of counsel when trial counsel failed to move to suppress the suicide note found on her computer. The post-conviction court rejected this claim:

> This "suicide note" was discovered (uncovered may be more accurate) on March 6, 1997, while a Baltimore City police officer was responding to an attempted suicide call at an address in the city that, as it turned out, was Jensen's home. Jensen conceded that the officer entered the unoccupied house without a warrant lawfully in light of the exigent circumstances. However, she argues that, after finding blood and two knives in the bathtub the officer made a second search as he was leaving, and it was unlawful.

> Upon noticing that a personal computer was on with its screen saver running, the officer tapped the space bar, causing the following message to appear:

> "I do not want to live anymore. I have not killed Ted and I have lied. I will go to jail and my prints are there and my blood is there. I did not kill him. There is something very strange going on. I do not want to live. I cannot take the pain of horrible things people do."

> Professor Grossman was asked if the mechanical suicide note would have been suppressed had an appropriate motion been filed. He answered "Absolutely!" The State and Mr. Keating agreed, and I heard no facts that would justify a contrary conclusion. Therefore, the State's answer to this allegation depends upon whether Mr. Keating's conscious decision to not seek suppression of this "note" was a valid tactical choice and whether its admission was sufficiently prejudicial, standing alone, to have altered the outcome of the trial.

> Mr. Keating testified that he did file a general suppression request in his omnibus motion that would have covered this had he requested a hearing. He pointed out, again, however, that almost from the beginning of his representation, he decided that Jensen would have to testify, and this affected

-24-

how he would deal with this and other evidence that cut both ways. He concluded, based upon legal research, that the trial judge would allow Jensen to be cross-examined about her attempts to commit suicide 16 days after the murder. Therefore, even if the computer message had been suppressed, the State could lay a foundation for having it admitted during the cross-examination. *See United States v. Havens*, 446 U.S. 620, 627 (198)).

Finally, Mr. Keating considered the computer message to be "two-edged." It contained Jensen's denial of having committed the murder before she was even arrested. Also, he knew the fact that she had lied to someone about not being at the victim's place of business on the night of the murder would be proven independently. (The note does not state that she lied "to the police," as argued in the Third Amended Petition, but that is the most reasonable interpretation of those words).

In deciding claims of ineffective representation, the test is not whether the lawyer won but rather whether his actions are defensible as valid trial tactics. Mr. Keating possessed vast experience in the prosecution and defense of criminal case. In this case, he may have chosen one of two ways to handle evidence with which other lawyers might disagree. Bu that does not make his decision actionable.

In affirming Jensen's conviction, the Court of Special Appeals described this as a "case with multiple strands of circumstantial evidence; all the strands tie appellant to the murder." Supra, 127 Md. At 120. Even if Mr. Keating made the wrong call on the evidentiary point, at best, it would have weakened only one strand. It would not have changed the result.

Paper No. 13, Ex. 28, p. 12-13.

The state court's recitation of the facts as adduced at trial and the post conviction hearing concerning the evidence of the suicide note and defense counsel's decision not to move to suppress it are amply supported by the record. The state court correctly applied *Strickland* in finding no error on the part of defense counsel in failing to move to suppress the suicide note. Accordingly, the state court's decision shall not be disturbed. 28 U.S.C.

§2254(d) and (e).

   4. Failure to Object to Hearsay Testimony.

Petitioner contends that trial counsel erred in not objecting to the hearsay testimony

of Russell Johnson.  The state post-conviction court found the following:

  Russell Johnson, friend and business associate of the murder victim, Mr. Daniels, testified for the State concerning two telephone conversations he had with Mr. Daniels two days before his death.  Mr. Johnson described the subject matter of those conversations as follows:

  Q: Now, did you learn of a disagreement between the Defendant and Mr. Daniels that took place on the Sunday before he was killed?

  A: Yes.

  Q: Can you tell the jury about that and how you learned about it?

  A: Well, he had been doing the radio show from the studios of WITH.  So, that Sunday he had called me–the show was to commence I think 12:00 and he had called me about 11:30 and said he could not make it.  I said Ted, what do you mean you cannot make it.  It is 11:30 and it starts in a half an hour.  I can't get to Baltimore until that time.  He says well, you know, I had a little discussion with the young lady and so I don't think I can make it.  I said okay.  Don't worry about it.  I said I will do it by telephone.  So, I had proceeded to get my notes together to prepare to do it by telephone.  I can call in and do the show from my home.  Fifteen minutes later he called me and said well, everything has been resolved.  I am on my way to the studio.  I said all right.  I will start and when I take a commercial break, you let me know you are there and you can take over.  That's what happened.

  Q: You say he was having what with a young lady?

  A: Some discussion, some–as people do, some argument or

whatever.

Q:      What specifically did he tell you?

A:      Let's see, he said I am with Dagmar now and we are having a
        cup of coffee and we are having some discussion and we are
        trying to work out some things.  I said fine, not a problem.  I
        will go ahead and do the show from home. (Tr. 2/9/98; pp. 97-
        99)

Counsel for Jensen points out that this testimony contained double
hearsay and Mr. Keating had a duty to object to it on that ground.  To support
this claim, he asked Jensen's expert, Professor Grossman, what "prudent"
counsel should have done under these circumstances and he replied "Object
to the question."   He then asked whether the objection would have been
sustained and Professor Grossman said: "I wouldn't have let him answer that
question."

It would appear from the tenor of this cross-examination that Mr.
Keating decided not to object to this rather vague testimony relating only to
motive so as not to highlight its importance because he knew that the victim
also told Mr. Johnson that the disagreement had been resolved and because the
witness would give favorable testimony during cross-examination.

I know of no requirement that trial counsel must do what is "prudent"
in order to render Constitutionally effective assistant to his client.  This is a
situation where reasonable minds might differ as to the best way to deal with
evidence that cuts both ways.  It does not warrant post conviction relief.

Paper No. 13, Ex. 28, p. 14-15.

This court discerns no basis on which it might reject the findings of the state post

conviction court.  The testimony by Johnson did not paint petitioner as the spurned lover

described by the prosecution. Rather, Johnson testified that she and the victim were

attempting to work things out. Petitioner has failed to meet her burden and the state court's

decision shall not be disturbed. *See* 28 U.S.C. 2254(d).

D. Sufficiency of the Evidence

Petitioner claims that the evidence adduced at trial was insufficient to sustain her conviction, and thus violated her right to due process. *See West v. Wright*, 931 F.2d 262, 266 (4th Cir. 1991), *overruled on other grounds*, 505 U.S. 277 (1992). The underlying standard as to such a claim is well-known: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The fact finder, rather than the reviewing court, is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." *(Id.)* Circumstantial as well as direct evidence must be considered and the government must be given the benefit of all reasonable inferences. *See United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Circumstantial evidence can be sufficient to support a conviction. *See Stamper v. Muncie*, 944 F.2d 170, 174 (4th 1991).

The court discerns no basis on which it might reject the conclusion of the Court of Special Appeals that the evidence, though circumstantial, was sufficient to sustain petitioner's convictions. The court reasoned as follows, in part:

> This is a case with multiple strands of circumstantial evidence; all the strands tie appellant to the murder. The State's evidence, if believed, showed, that it is likely that the following transpired: (1) Sometime between 7:30 p.m. and 9:00 p.m on the night of his death, Daniels let a visitor into his building, then locked the front door; (2) Daniels next unlocked his office door and escorted the visitor into his office, where the visitor turned up the volume of the television to block out the noise; (3) the visitor shot Daniels and next proceeded to the rear door but could not unlock it because Daniels had the key

-28-

to the deadbolt lock; (4) the murderer kicked (or otherwise broke out) the window pane in the rear door; (5) as the glass was broken, most of the glass shards fell next to the closed storm door; (6) the murderer then crawled through the opening provided by the open window and, in doing so, was cut by glass shards still in the pane.

Viewing the strands of circumstantial evidence as a whole and in the light most favorable to the State, the following was proven:

First although it was not required to do so, the State established a possible motive for the murder.  Appellant and Daniels were involved in a personal relationship.  Appellant was angry at Daniels and that anger was fueled by jealousy because she believed that Daniels was lying about being separated from his wife and about where he lived.  She was also angry because he was not paying enough attention to her and, she suspected was romantically involved with others.  Daniels was not only shot–he also suffered cuts and bruises, suggesting that the killer was angry at Daniels.  Whoever committed the murder probably did not have robbery or theft as a motive because valuables were left in his office and on his person.  Under these circumstances, the jury could infer that Daniels was killed for some personal, as opposed to monetary, motive.  Appellant possessed such a motive.

Second, appellant had the opportunity to kill Daniels.  Daniels was killed sometime between 7:30 and 9:00 p.m. on February 18, 1997.  Appellant was present at Daniels's building–according to her own admission–at approximately 8:20 p.m. on the evening of the murder.

Third, at 7:30 p.m. Daniels was expecting a visitor.  Appellant had an appointment with Daniels at 8:00 p.m.  It can be inferred that whoever killed Daniels probably was expected by him and that: (a) he let that person into the building and then locked the front door; and (b) he let the person into his office.  Given the coincidence of the time of appellant's appointment and the time of his death, and appellant's blood on the rear door, it can also be legitimately inferred that it is more likely than not that appellant was Daniels's last visitor.

Fourth, the glass in the bottom window pane of the back door of Daniels's office building was intact at 7:30 p.m. at which time Daniels was still alive.  Approximately an hour and a half later, the window was broken.  As counsel for appellant admitted at oral argument, it is reasonable to conclude that the person who broke the rear window pane was the person who

killed Daniels.  It is also reasonable to conclude that the person who broke the window did not possess a key to the building.  Appellant's fingerprints were found on the interior side of the window panes to the rear entrance to the building.  Her blood was found smeared on both sides of the rear wooden door.  The glass in the rear door was mostly found on the exterior side of the deadbolted door.  From this it can be inferred that a person without a key broke out he pane to get out of the building.  Going through at 11 ½ inch high, 22 ½ inch wide, thirty-eight inches off the ground at its lowest point, would take agility.  Appellant was agile as demonstrate by the fact she bragged that she could move her handcuffed hands from behind her back to her front.  Evan an agile person would likely be cut going through such a small opening.  Appellant, by her own admission, was cut by the broken glass in the pane.

Fifth, Daniels was killed with a .38 caliber weapon, the same type of weapon that appellant had reported stolen in 1994.  Some of the items that appellant reported stolen in 1994 were found in her home after the murder.  Her story in regard to the 1994 burglary is difficult to believe.  How could she mistakenly think that a thief had stolen two computer monitors if, in fact, they were still in the portion of the relatively small row house she occupied?  Why keep the gun box and the bullets for a gun that had been missing for over three years?  From this information, a rational trier of fact could conclude that appellant's .38 caliber handgun was never, in fact, stolen.  And from this they could conclude that appellant had the means to commit the murder.

Finally, appellant lied to the police and other when–if she had been innocent–the truth would have better served her purposes.  Appellant gave the police a false alibi when she said that after 7:30 p.m. on the night of the murder she was either at home or at a convenience store near her home.  Although she admitted on the stand that went to Daniels's office on the night of the murder, she never admitted this to anyone else prior to the trial.  The jury was entitled to conclude that appellant also lied to Detective Duckworth when she told him that her appointment was at 7:00 p.m. rather than 8:00 p.m. as she later told the jury.  Furthermore, when faced with the fact that her fingerprints and blood were found at the crime scene, Appellant attempted to commit suicide.  Ofttimes people commit suicide-or attempt it–to punish themselves and to avoid embarrassment for a grievous misdeed.  Attempting suicide only seventeen days after Daniels's murder and after she knew that her blood and fingerprints were near the crime scene and would incriminate her, could be viewed by a rational jury as an attempt to avoid the shame, hardship, and embarrassment that would inevitably accompany a murder conviction.

-30-

In addition to this circumstantial evidence, the jury had to weigh appellant's belated explanation for her fingerprints and blood being at the back door to Daniels's office. According to appellant she went to look for Daniels at his office even though she did not have a definite appointment with him. She cut her hand on the already broken glass after receiving no response from Daniels, and left without alerting the police or anyone else of what would appear to most people to be–at least–a break-in attempt. A rational jury might conclude that it was unlikely that she was cut reaching in to try to unlock the door because she admitted that the hall lights on the second floor were on; if there were glass shards there, it seems likely that she should have seen the glass and avoided injury is she had merely reached through the open window. Moreover, a rational jury could conclude that if she cut herself as she says she did, it would be unlikely that blood would be found afterwards smeared on both sides of the wooden door and on the glass pane.

Although appellant's final version of what happened on the night of the murder is possible, many unlikely things in life are possible. The mere fact that there exits a "possibility" of appellant's innocence does not mean that the circumstantial evidence produced by the State was insufficient to convict for it "is not necessary that the circumstantial evidence exclude every possibility of the [appellant's] innocence . . . ." Hebron, 331 Md. at 227 (quoting Gilmore 263 Md. at 293). Viewing the evidence as a whole, a rational jury could conclude that the circumstantial evidence presented at trial was inconsistent with appellant's innocence and, accordingly, that evidence proved appellant's guilt beyond a reasonable doubt. Appellant cites Wilson v. State, 319 Md. 530 (1990), and Warfield v. State, 315 Md. 474 (1989), as cases where the Court of Appeals reversed convictions based solely on circumstantial evidence. Appellant contends that "the circumstantial evidence of criminal agency is weaker [here] than that in either Wilson or Warfield." We disagree. Appellant's blood and fingerprints near the scene of the murder, the turbulent relationship between appellant and the deceased, appellant's deceit and false alibi, and her attempted suicide all weigh heavily against her innocence.

127 Md.App. at 120-24, 732 A.2d 319, 328-30. As the state appellate court's decision does

not involve an unreasonable application of federal law, this claim shall be dismissed under

28 U.S.C. § 2254(d).

*CONCLUSION*

For the reasons set forth, the petition shall be dismissed. An Order follows.


Date: April 27, 2007                                    _/s/_____
                                                        Andre M. Davis
                                                        United States District Judge